IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DOMINIC WHITE, | |
| Plaintiff, | |
| v. | Case No. 18-cv-5952 |
| JOHN GILMORE, DETECTIVE PETAR MILUTINOVIC, and the VILLAGE OF ARLINGTON HEIGHTS, | Judge Mary M. Rowland |
| Defendants. | |

### MEMORANDUM OPINION AND ORDER

Plaintiff Dominic White brought this suit claiming false arrest and malicious prosecution based on his arrest in September 2017 for alleged battery of John Gilmore. Defendants the Village of Arlington Heights and Detective Petar Milutinovic have moved for summary judgment in their favor. For the reasons stated below, Defendants' motion [94] is granted.

### SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.* After a "properly supported motion for summary judgment is made, the

1

adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id*. at 250 (internal quotations omitted).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (internal citation and quotations omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (*citing Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.* (citation omitted).

## BACKGROUND[1]

**I. Events in August and September 2017**

On the afternoon of August 28, 2017, John Gilmore went to the Village of Arlington Heights, Illinois Police Department (AHPD) and reported to officer Nelson

---

[1] The cited facts are undisputed unless otherwise noted. Defendants' Rule 56.1 Statement of Facts in support of their motion for summary judgment (Dkt. 96) is abbreviated as "DSOF." White's Rule 56.1 Statement of Additional Facts (Dkt. 100) is abbreviated as "PSOF". Defendants responded to White's statement at Dkt. 106. White responded to Defendants' statement at Dkt. 102.

2

Calzadilla that he was attacked in front of his Arlington Heights residence in the early morning hours of August 26, by a 6'0", tanned, white male wearing a pink or peach shirt. (DSOF ¶5).[2] Gilmore stated he believed the man had followed him on foot from a nearby street corner as Gilmore walked home from downtown Arlington Heights. (*Id.*) Gilmore reported that he asked the man what he wanted and next remembered waking up with abrasions to his head and face. (*Id.*) When Gilmore awoke he noticed he was missing $200 which he speculated could have fallen from his pocket as he was retrieving his phone to try (unsuccessfully) to take a picture of the person, as he still had his wallet and phone. (*Id.*) Gilmore stated he was "half in the bag" and could not further identify the person. (*Id.*) Gilmore said he did not initially intend to file a report, but after talking to his family, he decided to report the incident for the safety of his neighbors and himself. (*Id.*) At that point he did not want to pursue criminal charges because he would not be able to recognize his assailant. (*Id.*) Gilmore did provide Calzadilla photographs of his head injuries. (*Id.*)

The next day, August 29, Gilmore called the AHPD and again spoke to Officer Calzadilla. (*Id.* ¶6). Gilmore reported that he now remembered his assailant's voice and it was that of White, who was a business acquaintance. (*Id.*) Gilmore said White was experiencing hardship including a divorce that involved an order of protection, and possible drug use. (*Id.*) He stated that White had been taking his hardship out on those around him and had a "grudge" against Gilmore because Gilmore had asked White's boss to stop him from "bad-mouthing" Gilmore after Gilmore stopped using

---

[2] All dates are from 2017 unless otherwise noted.

3

White's business services. (*Id.*) Gilmore gave Calzadilla White's Arlington Heights address and offered to review any video footage in the area that might have shown White returning to his residence from Gilmore's residence. Calzadilla reported that Gilmore was not "absolutely certain" his assailant was White, but that Gilmore wanted to pursue charges. (*Id.* ¶7).

Two days later, on August 31, Sgt. Buczynski assigned Detective Milutinovic to investigate Gilmore's battery report. (*Id.* ¶8). Milutinovic had been employed by the AHPD since 2008 and had been a detective since 2012. (*Id.* ¶2). Before being assigned to this investigation, Milutinovic did not know Gilmore or White. (*Id.* ¶9). Once assigned, Milutinovic reviewed Calzadilla's police reports of his interviews of Gilmore. (*Id.* ¶10). Milutinovic also reviewed the photographs of Gilmore's head injuries; Milutinovic believed they were consistent with Gilmore's assertion that he was first struck from behind, which caused him to fall forward onto his condominium steps. (*Id.* ¶11). Milutinovic then phoned Gilmore who stated he now had a better memory of the incident and was certain that White was his assailant. (*Id.* ¶12). Multinovic recalled two phone conversations with Gilmore before meeting him in person on September 13. (*Id.*).

During their discussions, Gilmore repeated his prior statements and further explained his relationship with White. He reported that he and White were friends and former business acquaintances as Gilmore was a realtor and White was in the mortgage business, that White was having difficulties with his family and employment, and that the two had quit doing business and had a falling out when

4

White alleged that Gilmore was badmouthing him to White's boss. (*Id.* ¶13). Gilmore added that White called him an "asshole" for calling White's boss. (*Id.*).

Gilmore told Milutinovic that he walked about two blocks to his home from downtown Arlington Heights before the attack, and that he first noticed someone standing by bushes at a nearby intersection a half block from Gilmore's apartment building. (*Id.* ¶14). Gilmore told Milutinovic that as White closed in on him, Gilmore pushed him away and told White to leave him alone, at which point Gilmore turned around and was struck in the head. (*Id.* ¶15). Miltinovic reviewed about six hours of footage from a Village video camera one block north of White's residence. (*Id.* ¶16). The camera is positioned at the northeast corner and faces the intersection. (*Id.*) Milutinovic had reviewed White's Department of Motor Vehicles photograph and a mug shot of White but did not see anyone who looked like White pass through the intersection on the video. (*Id.*) Milutinovic was aware there were multiple ways to get to Gilmore's residence from White's without passing through that intersection. (*Id.*).

On September 11, at 7:05 p.m. Gilmore called the AHPD from the Shakou Restaurant in Arlington Heights and reported that White had just threatened him in the restaurant. (*Id.* ¶17). Officer Brandon Clabough responded to the restaurant and reported that Gilmore said that White approached his table, leaned over and whispered in his ear: "Don't ever mention my name again or I'll come back." Gilmore then reportedly said: "Did you just threaten me in public?" to which White stated: "No, you fatass, you need a bigger chair", before leaving. (*Id.*). Clabough also reported that Gilmore identified a text he claimed was from White which was sent at 6:58 p.m.

5

(after White left the restaurant) which read: "Please don't mention my name personally or professionally again." (*Id*. ¶18). Gilmore also told Clabough about his battery report against White, and that he was alarmed, felt threatened, feared for his safety, believed White will return and hurt him, and was willing to sign complaints against White. (*Id*. ¶19). The following day Sgt. Buczynski told Milutinovic about Gilmore's new complaint against White. (*Id*. ¶20). Milutinovic called Gilmore, who essentially repeated what was in Clabough's report. Gilmore also told Milutinovic he was having dinner with Gary Cortesi and Tom Woznicki when the incident occurred. (*Id*.). Milutinovic interviewed Cortesi and Woznicki, who confirmed that White walked up to Gilmore and said something in his ear which they could not hear, but both recalled White told Gilmore he is a "fat ass" and needed a bigger chair. (*Id*.).

**II. Battery Complaint, White's Arrest and Trial**

On September 13, Milutinovic met Gilmore at his home to have Gilmore sign a battery complaint. (*Id*. ¶21). Before Gilmore signed, Milutinovic again went over the incidents of August 26 and September 11 but did not ask if Gilmore wanted to sign a complaint for the September 11 incident. (*Id*.). When Milutinovic asked about September 11, Gilmore stated he had previously told co-workers and other acquaintances that he had reported White to the police for the August 26 battery, and that he believed the September 11 incident occurred because White likely became aware of the prior report. (*Id*. ¶22). Milutinovic believed the September 11 incident was further support of Gilmore's battery claim against White. (*Id*.). Milutinovic asked Gilmore if he was willing to testify that White was his assailant and Gilmore

6

responded "yes". (*Id*. ¶23). He also asked, in accordance with his practice when an identification was made, how certain Gilmore was on a scale of one to ten that White was his assailant, and Gilmore said "ten." (*Id*.) Milutinovic then presented Gilmore with a misdemeanor battery complaint. (*Id*. ¶24). Gilmore attested in Milutinovic's presence that: "Dominic White…had, on or about August 26, 2017…, committed the offense of battery in that he intentionally caused bodily harm to John Gilmore, in that Dominic White struck Gilmore on the back of his head which caused Gilmore to fall to the ground." (*Id*.) As a result, Gilmore incurred abrasions to the back of his head and face." (*Id*.).[3]

After Gilmore signed the criminal complaint, Milutinovic and Detective Joe Murphy went to White's residence to arrest White. (*Id*. ¶25). When no one responded at White's door, Milutinovic left his business card for White to contact him. (*Id*.) White testified he called Milutinovic on September 13 and after learning about the charge, stated he was not in Arlington Heights on August 26 and that White's attorneys would contact Milutinovic. (*Id*. ¶26). After speaking to White's attorney, Timothy O'Donoghue, Milutinovic interviewed White's girlfriend Lauren Grybash on September 26, who stated that she was continuously with White at her Palatine residence from 6:30 or 7:00 p.m. on August 25 through the following morning, including at the time Gilmore was allegedly attacked. (*Id*. ¶27). Milutinovic memorialized and reported Grybash's account. (*Id*. ¶28). Milutinovic told Gilmore

---

[3] The misdemeanor complaint (Dkt. 96-12, Ex. I) was signed on September 21, 2017. Neither party addresses why this date is different from September 13 but it does not impact the Court's analysis.

7

about Grybash's account and Gilmore confirmed he still wanted to move forward on his complaint. (*Id.* ¶29).

Attorney O'Donoghue brought White to the station for processing on September 27. (*Id.* ¶30). White was arrested that day by Milutinovic for misdemeanor battery to Gilmore. (*Id.* ¶1). Milutinovic filed a booking sheet with the arrest report showing White was placed into custody at 9:30 a.m. (*Id.*). (Because of a computer issue, they returned the following day to complete the booking process. (*Id.*)). A Cook County Assistant State's Attorney prosecuted the misdemeanor battery charge against White. (*Id.* ¶31). White was found not guilty after a bench trial which began January 30, 2018 and continued until March 7, 2018. (*Id.* ¶33).

## ANALYSIS

Milutinovic seeks summary judgment on the §1983 false arrest claim (Count I) because he argues that he had probable cause to arrest White for battery. In the alternative, Milutinovic contends he is entitled to qualified immunity. Defendants further argue that dismissal of Count I requires that judgment be entered in the Village's favor on the indemnification claim (Count VI).[4]

**I. False Arrest Claim**

"Probable cause is an absolute bar to a claim of false arrest asserted under the Fourth Amendment and section 1983. Probable cause exists to arrest a suspect if at the time of arrest the facts and circumstances within the arresting officer's knowledge

---

[4] The remaining claims are state law claims against Gilmore for false arrest (Count III), malicious prosecution (Count IV), and IIED (Count V). Count II was voluntarily dismissed on October 15, 2019. (Dkt. 68). Gilmore asserts state law counterclaims against White for civil battery and negligence.

8

and of which he has reasonably trustworthy information would warrant a prudent person in believing that the suspect had committed or was committing an offense." *Dollard v. Whisenand*, 946 F.3d 342, 353 (7th Cir. 2019), reh'g denied (Feb. 24, 2020) (citations and quotations omitted).[5] Probable cause is evaluated objectively; it requires an officer's belief "be reasonable, not that it be correct." *Huff v. Reichert*, 744 F.3d 999, 1007 (7th Cir. 2014). Probable cause must be "more than bare suspicion but need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false." *Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000) (citation and quotations omitted). It is "not a high bar" and "the existence of some contrary evidence does not defeat probable cause." *Hyung Seok Koh v. Graf,* 307 F. Supp. 3d 827, 848 (N.D. Ill. 2018) (citations and quotations omitted).

Further, qualified immunity protects an officer who has "*'arguable'* probable cause." *Huff,* 744 F.3d at 1007 (emphasis added). "Arguable probable cause exists when a reasonable officer in the same circumstances and ... possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well-established law." *Id*. (internal citation and quotations omitted). Qualified immunity "gives public officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly

---

[5] "Probable cause hinges on the elements of the relevant criminal statute." *Mahnke v. Garrigan*, 428 F. App'x 630, 635 (7th Cir. 2011). In Illinois, battery is: "A person commits battery if he or she knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." 720 ILCS 5/12-3.

9

applied, it protects all but the plainly incompetent or those who knowingly violate the law." *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 713 (7th Cir. 2013) (internal citations and quotations omitted).

"[O]nce [a qualified immunity defense] is raised, the burden shifts to the plaintiff to defeat it." *Holleman v. Zatecky*, 951 F.3d 873, 877 (7th Cir. 2020). "To overcome [Milutinovic's] invocation of qualified immunity, [White] must show both (1) that the facts make out a constitutional violation, and (2) that the constitutional right was 'clearly established' at the time of the official's alleged misconduct." *Abbott*, 705 F.3d at 713. Probable cause "inherently allows room for reasonable mistakes" and qualified immunity "affords an added layer of protection by shielding officers from suit for damages if 'a reasonable officer could have believed [the arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed.'" *Id.* at 714 (citation omitted).

Here, White has the burden of defeating Milutinovic's qualified immunity defense "either by identifying a closely analogous case or by persuading the court that the conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully." *Id.* at 724. "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right" meaning that "existing precedent must have placed the statutory or constitutional question beyond debate." *Leiser v. Kloth*, 933 F.3d 696, 702 (7th Cir. 2019) (quoting

10

*Reichle v. Howards*, 566 U.S. 658, 664, 132 S. Ct. 2088 (2012)). White has not met this burden.

White maintains that the qualified immunity question requires a jury to resolve disputed facts. But the facts about what Milutinovic knew at the time of White's arrest are not in dispute. White believes Milutinovic should have *interpreted* those facts differently and that he made investigatory mistakes. These arguments do not defeat qualified immunity here. *See Hunter v. Bryant*, 502 U.S. 224, 228 (1991) ("Immunity ordinarily should be decided by the court long before trial.").

The undisputed facts are that at the time of White's arrest, Gilmore identified White as the person who battered him to Milutinovic. It is well-settled that "[s]o long as a reasonably credible witness...informs the police that someone has committed, or is committing, a crime, the officers have probable cause to place the alleged culprit under arrest, and their actions will be cloaked with qualified immunity [even] if the arrestee is later found innocent." *Wollin v. Gondert*, 192 F.3d 616, 625 (7th Cir. 1999) (internal citation and quotations omitted). *See also Woods*, 234 F.3d at 987.

White responds, however, that: (1) Milutinovic should not have believed Gilmore; (2) Milutinovic should have done a better investigation; and (3) White's girlfriend's confirmation of his alibi should have led Milutinovic to decide there was no probable cause to arrest.

First as to Gilmore's credibility, White contends Gilmore made "multiple conflicting statements". The undisputed facts show that while Gilmore could not initially identify the person who attacked him, the next day he followed up his initial

11

report stating that he remembered more and believed it to be White, and then in the weeks following stated he was certain it was White and his confidence in his identification was a "ten" on a scale of one to ten. White suggests that Gilmore's inability to initially identify White, who he had known for years, calls into question the identification. But "[p]robable cause is a holistic, commonsense inquiry, and officers are allowed to draw reasonable inferences based on their experience and judgment." *Hyung Seok Koh*, 307 F. Supp. 3d at 848–49.

White also challenges Gilmore's credibility by arguing that Gilmore was a "stumbling drunk" the night of the alleged attack. However White does not cite any evidence that at the time of White's arrest, Milutinovic knew Gilmore was a "stumbling drunk" on August 26. The evidence shows only that Milutinovic knew Gilmore had been drinking.[6] The testimony White cites showing Gilmore had "at least 6" drinks is from Gilmore's deposition testimony in 2020, not from any evidence that Milutinovic knew before September 27, 2017. *See Abbott*, 705 F.3d at 714 (focus is on what officer knew at the time of the arrest). Importantly, White does not cite any clearly established law requiring an officer to disbelieve a victim who did not identify the suspect in his initial report to police or who had been drinking alcohol before he was attacked. To the contrary, the Seventh Circuit has explained that "[n]othing suggests that a victim's report must be unfailingly consistent to provide probable cause" and the "credibility of a putative victim or witness is a question, not for police

---

[6] The police report referred to Gilmore being "half in the bag" but did not explain further. (Exh. D, Dkt. 96-6). Milutinovic was told that Gilmore was "three sheets to the wind". PSOF ¶44. But there is no evidence that Milutinovic understood these statements to mean Gilmore was a "stumbling drunk" on August 26.

12

officers in the discharge of their considerable duties, but for the jury in a criminal trial." *Spiegel v. Cortese*, 196 F.3d 717, 725 (7th Cir. 1999), as amended (Jan. 7, 2000)).

Second, White complains about the quality of the investigation. He asserts that Milutinovic did not try to talk to White or corroborate Gilmore's story. It is true that "[a] police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest" and must pursue "reasonable avenues of investigation" particularly when "it is unclear who committed the crime." *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1016 (7th Cir. 2006) (citations and quotations omitted). But as explained, police have probable cause to arrest the suspect once "a reasonably credible witness informs an officer that a suspect has committed a crime." *Abbott*, 705 F.3d at 716 (citations omitted). There is "no constitutional obligation to conduct any further investigation before making an arrest if they have received information from a reasonably credible victim [] sufficient to supply probable cause…even if sound police technique would have required such further investigation." *Woods*, 234 F.3d at 997. And here Milutinovic *did* investigate. White does not contend that there is any evidence of Milutinovic falsifying any reports, fabricating evidence, conspiring with Gilmore, or having a bias against White.

White argues, however, that Milutinovic ignored exculpatory evidence. White points to the video evidence which did not show him at Gilmore's residence at the relevant time. He also contends that Milutinovic did not consider that the "bad blood" between the former friends meant Gilmore might have lied about White being his assailant. These arguments do not help White meet his burden since he does not cite

13

law requiring an officer to resolve potential inconsistencies or get to the bottom of a grudge. Indeed "no clearly established precedent required [the officer] to resolve these inconsistencies before arresting [the suspect]." *Spiegel*, 196 F.3d at 724. *See also Askew v. City of Chicago*, 440 F.3d 894, 897 (7th Cir. 2006) ("inconsistencies and glitches that characterize real investigations do not disentitle police to rely on eyewitness statements"); *Anderer v. Jones*, 385 F.3d 1043, 1049 (7th Cir. 2004), amended on denial of reh'g, 412 F.3d 794 (7th Cir. 2005) (an officer has "no constitutional obligation to conduct any further investigation in the hopes of uncovering potentially exculpatory evidence.") (citation and quotations omitted).

Finally, White relies on his statement that he was with his girlfriend, Lauren, the night of the alleged battery, and Lauren confirmed that, along with details of what they did that evening and that White remained at her house through the morning. But a reasonable officer in the same circumstances and possessing the same knowledge as Milutinovic "*could have* reasonably believed that probable cause existed in light of well-established law" (*Huff*, 744 F.3d at 1007, emphasis added) permitting an arrest based on reasonably credible victim informing Milutinovic that White committed the crime. Milutinovic also believed the September 11 incident further established or was another indication of motive to support Gilmore's battery claim against White. (DSOF ¶22).

White does not cite any law undermining the conclusion that Milutinovic had arguable probable cause. The cases White relies on either affirmed a finding of qualified immunity (*Eversole v. Steele,* 59 F.3d 710 (7th Cir. 1995)) or involved

14

disputed issues of fact about the circumstances of the arrest (*Gonzalez v. City of Elgin,* 578 F.3d 526 (7th Cir. 2009); *Meyer v. Robinson,* 992 F.2d 734 (7th Cir. 1993)).[7] As discussed, the relevant facts about what Milutinovic knew at the time of White's arrest are not in dispute.

White has not met his burden to defeat Milutinovic's qualified immunity defense. The Court does not need to decide whether Milutinovic had probable cause because he had *arguable* probable cause, providing him with qualified immunity from White's claim here.[8]

**II. Indemnification and Remaining Claims**

Under Illinois law, "[a] local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." 745 ILCS 10/2-109. The false arrest claim does not survive summary judgment against Milutinovic, and so White's indemnification claim against the Village also does not survive summary judgment.

Because the Section 1983 false arrest claim does not survive summary judgment and is the only remaining federal claim in this case, the Court declines to exercise supplemental jurisdiction over the remaining state law claims. *See* 28 U.S.C. §

---

[7] White also relies on a number of cases from outside of this circuit that involve decisions denying qualified immunity, for example, where there was evidence of any officer fabricating statements on an arrest affidavit.

[8] White does not explain the relevance of his discussion about whether there was probable cause to charge White with disorderly conduct for the September 11th incident. (Dkt. 101 at 12-15). Rather it is undisputed that "Milutinovic believed the September 11 incident further established or was another indication of motive to support Gilmore's battery claim against [White]" for the August 26 incident. (DSOF ¶22).

1367(c)(3); *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 631 (7th Cir. 2016) ("when the federal claims are dismissed before trial, there is a presumption that the court will relinquish jurisdiction over any remaining state law claims.").[9]

## CONCLUSION

For the stated reasons, Defendants' motion for summary judgment [94] is granted. Judgment is entered in favor of Defendants and against Plaintiff Dominic White. The Clerk is directed to close the case.

E N T E R:

Dated: February 16, 2021

*Mary M Rowland*

MARY M. ROWLAND
United States District Judge

---

[9] Although technically Gilmore was named in the §1983 false arrest claim (Dkt. 45), on Gilmore's oral motion to be dismissed from the case, the Court decided it had pendant state jurisdiction (only) over him (*see* Dkt. 68). Indeed Gilmore is a private citizen and the record does not reveal any basis under which he have acted under color of state law. *See Barnes v. City of Centralia, Illinois*, 943 F.3d 826, 831 (7th Cir. 2019) ("Action is taken under color of state law when it involves a misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law... Section 1983 does not cover disputes between private citizens....") (internal citations and quotations omitted).

16